DECISION
This land valuation proceeding was tried by the Court, Darigan, J., without a jury, over six days between November 14 and November 21, 2002. At issue is the just compensation due to the plaintiff, Richard J. Conti ("Conti") for a parcel of his land, Plat 49, Lot 71 (1127 Douglas Pike), Smithfield, Rhode Island (the "property"), which was acquired by the defendant, Rhode Island Economic Development Corporation ("EDC"), by eminent domain on May 28, 1996, in connection with the so-called Fidelity project.[1] EDC contends that Mr. Conti has received just compensation($158,000.00) for his property, which was previously paid to him.
Mr. Conti, however, contends that the fair value of his property at the time of its acquisition by EDC was $600,000.00, based on its highest and best use as a medical office building. The evidence for this valuation was offered through the opinion testimony of plaintiff Conti's expert appraiser, Thomas Andolfo who being duly qualified as an expert testified that this valuation was based on the fact that Fidelity was coming to, and would be developing, the corporate office park adjacent to the Conti property. Recognizing that an issue of whether or not enhancement of value because the Fidelity project would be considered, Mr. Andolfo also testified that, without consideration of the enhancement the Fidelity project would bring to the Conti property, the fair value of the property would be reduced to $427,000.00 based upon a highest and best use as a general office building. Mr. Andolfo based his opinion upon six comparable sales from throughout Rhode Island which will be addressed later in this decision.
For its part, EDC offered the testimony of Paul E. Vincent, a certified general appraiser employed by the Rhode Island Department of Transportation ("DOT"), who was duly qualified as an expert real estate appraiser by the Court. Mr. Vincent testified that, in his opinion, the fair value of the Conti property at the time it was acquired by EDC was $158,000.00, based upon its highest and best use as vacant, industrially zoned land. Mr. Vincent based his opinion of value on three comparable sales — one included in the staff appraisal performed by DOT immediately prior to the taking for which Mr. Vincent was the review appraiser, and two additional sales of vacant, industrially zoned land located in close proximity to the Conti property, which sales took place shortly before and shortly after the taking.
The facts involving the condemnation and proceedings are generally not in dispute except for the value of the taking, and whether or not the Court should consider enhancement of value by virtue of the Fidelity announcement and whether or not the subject property was within the "scope of the Fidelity project."
Plaintiff, Richard Conti, is a Rhode Island resident and fee simple owner of real estate located in the vicinity of Route 7 and Route 116 in the Town of Smithfield, Rhode Island. The parcel in question is identified as Town of Smithfield's Tax Assessor's Plat 49, Lot 71 (hereinafter the "Parcel") and is located at 1127 Douglas Pike, Smithfield, Rhode Island.
Defendant, Rhode Island Economic Development Corporation, is an agency of the State of Rhode Island and has been granted statutory authority to take property by eminent domain pursuant to Rhode Island General Laws § 42-64-9, the "Condemnation Statute." Plaintiff's Exhibit No. 3. Acting under the Condemnation Statute, Plaintiff's parcel was condemned on May 28, 1996 and title transferred to the Defendant. Id.
The Parcel was described as containing 3.88 acres, or approximately 169,013 square feet of land area. The topography of the site is rolling, with most of the site situated above street grade. The Parcel is triangular in shape, fronting on Douglas Pike for approximately 630 linear feet. It is undisputed that the site is benefited by all public utilities, including sewer and water. Douglas Pike (Route 7) is by all evidence a major commercial artery which runs in a north and south direction from the City of Providence to the Massachusetts State Line. The subject property was uniquely located diagonally opposite Bryant College and adjacent to, on its northerly side, the entrance to the Island Woods Office Park (hereinafter "Island Woods Park"). Plaintiff's Exhibit Nos. 16, 17, 18, 19 and 21.
Island Woods Park was developed in 1988 and was improved with all utilities and improved with an interior roadway. The Park consisted of approximately 130 acres and at the time of the taking had one tenant, a bio tech firm, Alpha Beta Technologies.
However, before addressing the question of value of the subject parcel at the time of the taking, the Court must consider and resolve the issue which has been strongly asserted by the plaintiff that the subject property is entitled to any enhancement in value devaluing to the subject property by the announcement of the relocation of the Fidelity Corp. to the Island Park Development.
The defendant, Rhode Island Economic Development Corporation has with equal vigor, disputed the claim of the plaintiff that enhancement of value should be considered and avers that enhancement of value is inappropriate because at all times incident to these proceedings, the subject property was within the scope of the Fidelity Project, so called, from the project's inception and therefore, enhancement should not be considered as a matter of law.
 ENHANCEMENT
The defendant contends, based upon the United States Supreme Court holding in United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336 (1942), that the actual value of the property as identified by Mr. Andolfo in the amount of $600,000.00 should not be accepted by this Honorable Court because it represents an "enhanced value." The defendant suggests that a portion of the value identified by Mr. Andolfo was due and attributable to the Fidelity announcement of its relocation in the Island Woods Park development. The plaintiff nevertheless urges this Honorable Court to reject defendant's argument, and submits that a review of Miller and its progeny, allows and permits the instant parcel to be valued at its fullest and fair price.
While the general rule clearly provides that the value of property taken shall be determined as of the date of condemnation, in certain situations, the government's initial announcement of a public project will cause property within the scope of the development to increase in value. Characterized as the "Scope of the Project Rule," the standard was first annunciated by the United States Supreme Court in the case ofUnited States v. Miller, supra. In this example of specific enhancement of value, the United States government had acquired various lands by damming a river and flooding a valley, thereby creating a large lake. The condemned property, which was before the creation of the lake uncleared, inaccessible property had become, by virtue of the improvement, waterfront property.
In an action for condemnation of the "new" beachfront property, the owners contended that they were entitled to value as lakefront property. The Supreme Court held that the owners were not entitled to receive the market value for their land as specifically enhanced by the dam project.
The plaintiff urges the Court to apply the so-called "Scope of the Project" Rule and consider an enhancement of the plaintiff's property to be a general enhancement, as opposed to a specific enhancement of the plaintiff's property — a specific enhancement being not eligible for compensation. The plaintiff in support of this theory cites to US v. 320Acres of Land, 602 F2, 762 (5th Circuit 1979) and US v. Reynolds,397 U.S. 14 (1970).
The 320 Acres case involved the condemnation of property in Florida for the Everglades National Park. The Park was first established in 1947, but eleven years thereafter, in 1958, Congress enacted additional legislation, increasing the Park size, but limiting the new acquisition budget to 2 Million Dollars. Consistent with its statutory and legislative mandate, the Department of Interior began acquiring property in 1966, promptly exhausting the 2 Million Dollar budget. In 1970, legislation was again enacted which increased the budget an additional 22 Million Dollars, and land acquisition was recommenced in 1971. The petitioner's property, consisting of 320 acres, was condemned in May of 1976.
The Court ruled that while the petitioner's 320 acres was clearly within the original scope of the project, the condemnee was nevertheless entitled to full and fair compensation, even though it was obviously enhanced. The Court found that a strict application of the "Scope of the Project Rule" would act to deny fundamental precepts of fair compensation for property taken. The Court held that the Scope of the Project Rule was merely a secondary valuation rule, the primary, constitutionally founded rule was that compensation should be just for both parties.
Essentially, argues the plaintiff, the Court in 320 Acres held that general enhancement was compensable unless it was established that the additional value was created solely due to the public awareness that the condemnee's property might be taken for the project. Id. at 788. The Court identified that the crucial inquiry is whether the condemnee could reasonably anticipate that he would be able to devote the property to its highest and best use, enjoying the advantages inherent in its proximity to the nearby government project, without serious apprehension that the land would soon be condemned. Id. at 793.
With regard to the Miller case, the plaintiff argues that unlike the facts in the Miller case, the project itself was not a public works project necessary to the well being and health of its citizens — it was, however, an economic development project to encourage and facilitate the development of a private for profit industry. The plaintiff also has argued that the plaintiff's subject property was not and never has been an integral part of the Fidelity project and that the Island Woods Park had pre-existed the defendant's Fidelity project.
Again citing to Miller, supra, the enhanced value of the subject property is one of a general nature, not specific. Positive general enhancement includes such factors as: increased traffic flow to property, State Highway Commissioner v. Parker, 387 S.W.2d 505 (Mo. 1965); improved traffic conditions, more convenient parking and increased business by virtue of the improvement have all been held to be non-special (and compensable) benefits. See Rome Urban Renewal Agency v.Rome Television Center, 52 A.D.2d 711, 381 N.Y.S.2d 564 (1976). Seegenerally 3 Nichols on Eminent Domain, Section 8A.02(4)(a). All of these improvements have been recognized as enhanced values by virtue of general benefits and are, in plaintiff's view, compensable.
Finally, the location of plaintiff's parcel, by its nature, would be enhanced by the impending development of the adjacent industrial Island Woods Park. Whether it would be the relocation of Fidelity under the auspices of RIEDC or any other major entity, the plaintiff was bound to receive an economic benefit. Simply because the defendant facilitated one entity, the plaintiff should not be deprived of "the advantages inherent in its proximity to a "nearby government project."
The plaintiff argues that under the particular circumstances of this case and the evidence and probative opinions adduced at trial, plaintiff submits that the enhanced value is of a general nature and is therefore compensable. The plaintiff opines that justice, as well as equity, require that the petitioner should be awarded full compensation for the actual value of his property as of the time it was taken, albeit enhanced.
The defendant, Rhode Island Economic Development Corp. has argued, as one might surmise, that the theory and cases cited by the plaintiff do not apply to the case at Bar.
The defendant contends that because the subject property was included within the scope of the project from its inception that no enhancement may be awarded to the subject property.
In addition, the defendant argues that a review of the evidence clearly establishes the fact that the subject property was within the scope of the project from its inception, the plaintiff's position to the contrary notwithstanding. See Defendant's Exhibit E, the resolution of the Board of the Rhode Island Economic Development Corp.
In addition, the defendant argues that the Fidelity project was an exercise of "an essential governmental function of the State for public purposes pursuant to R.I.G.L. § 42-64-4. The defendant rebuts the plaintiff's assertion that the Fidelity Project was not a "public works project" and cites § 42-64-5(3). See R.I.G.L. § 42-64-5(3) which states that one of the purposes of EDC is to promote and encourage the preservation, expansion, and sound development of new and existing industry, business, commerce, agriculture, tourism, and recreational facilities in the state, which will promote the economic development of the state and the general welfare of its citizens.
In his brief, the plaintiff takes a different tack and relies on UnitedStates v. 320 Acres of Land, 605 F.2d 762 (5th Cir. 1979) to argue thathere like in 320 Acres the plaintiff should ". . . .be able to devote [his] property to its highest and best use, enjoying the advantages inherent in its proximity to the nearby government project, without serious apprehension that the land would soon be condemned." The defendant argues that reliance on 320 Acres is misplaced as the case outlines a very narrow, fact-specific exception to the so-called "scope of the project" rule. In 320 Acres, the defendant avers, the Fifth Circuit identified three critical factors which would:
 ". . .militate against triggering the [scope of the project] rule as of the date of the announcement: first, the length of time between the announcement and the taking; second, the mere token commitment at the time of the project announcement to the land acquisition program necessary to complete the project; and third, the governmental blessing given area land owners to use the sell their property freely.
320 Acres, 605 F.2d at 806. Without again reiterating the long and complicated set of facts presented in 320 Acres, the defendant argues that none of the cited three factors are remotely implicated here. In the case at Bar, there was very little delay between the announcement of the Fidelity project and the taking; EDC was irrevocably committed to the project when announced; and no blessings were given this plaintiff or anyone else that they could freely use and sell their properties. Indeed, avers the defendant, the project was put on a fast track with EDC pushing to obtain valuations of the properties to be condemned and to undertake negotiations with the property owners in advance of the condemnation. See DPFF Nos. 54 and 55, and Defendant's Ex. C.
The defendant argues that the particular facts presented in the 320Acres case, and the holding of the Supreme Court thereon must fail in the light of our State Supreme Court 1978 case, Fuller v. Rayhill,391 A.2d 103 (1978). In Fuller, the Supreme Court applied the scope of the project rule even though the petitioner's land was taken ten years after the first public hearing for a highway project where it was stressed neither the location nor design of the proposed interchange was finalized. Furthermore, in that case, the petitioner's land was not taken until six years after land contiguous to petitioner's parcel had been taken. Notwithstanding this delay and the fact that no definite commitment was made as to the exact location of the highway interchange until 1972 when the petitioner's property was taken, the Supreme Court nevertheless applied the scope of the project rule and precluded any enhancement in the value of the property.
With regard to plaintiff's general-versus-specific enhanced value argument, plaintiff's citation to 3 Nichols, The Law of Eminent Domain,
§ 8A.02(4)(a) and the cases discussed therein is inapposite argues the defendant, as that section of the treatise and the cited cases dealt with situations where an owner has only a portion of his property taken and where the general enhancements to the remainder must be offset against any severance damages awarded.
The defendant concludes by urging this Court that plaintiff's enhancement argument must fail where, as in this case, his property was included within in the scope of the Fidelity project from its inception, and the general rule of valuing the property without consideration of the governmental project, either positively or negatively, applies. Accordingly, the defendant argues, given Mr. Andolfo's own testimony, his $600,000.00 valuation of the Conti property must be disregard as an inappropriate enhancement of the subject property in violation of law. (See DPFF Nos. 26 and 27).
The plaintiff in this case, as with the value of the subject property taken, has the burden of proving that which he asserts or claims. In this instance it is the proof on the facts and the law that the plaintiff is entitled to an enhanced value of his property because of the announcement of the Fidelity project.
A careful review of the testimony heard at trial, the exhibits marked as full in this case and the briefs filed by the parties at the conclusion of trial and the reasonable inferences to be drawn from this evidence leads this Court to the following findings of fact and conclusions of law on the issue of enhanced value of the subject property:
 That on May 28, 1996, the defendant R.I. Economic Development Corporation (EDC) acquired fee simple title to the plaintiff Conti's property through eminent domain in furtherance of the "Fidelity Project" so-called. (Plaintiff's Exhibit 3, Exhibit 4, and Defendant's Exhibit E and Exhibit E 2.)
 That the taking of the title of the subject property in this case by the defendant EDC was taken by the defendant EDC pursuant to R.I.G.L. Title 42, Chapter 64 and $158,000.00 was deposited in the Registry of the Court as compensation for the property of the defendant.
 That the acquisition of the subject property was at all times within the Scope of the Fidelity Project as outlined and announced by the defendant EDC (Plaintiff's Exhibit 3 and Defendant's Exhibit e) and is consistent with the case law cited by the defendant in this case.
 That the argument of the plaintiff Conti for an enhanced valuation of $600,000.00 leased on the announcement of the Fidelity Project — with respect to the subject property was contrary to the facts and the law in this case.
 That the law in Rhode Island is clear and unambiguous with regard to enhanced value of real estate as articulated in the case of Fuller v. Rayhill, 391 A.2d 103 (1978) and that plaintiff's reliance in the case of U.S. vs. 320 Acres of Land, 681 F.2d 760 (5th Circuit 1979) is misplaced in that the 320 Acres case is clearly distinguishable on the facts and the law, from the case at bar and is not persuasive to the Court.
 That the expert testimony of the plaintiff's expert Thomas Andolfo, that the value of the subject property of $600,000.00 for a medical office building based on the enhancement value of the subject property by the Fidelity Project, shall not be considered by the Court as relevant, probative and material in this case.
 STANDARD FOR THE VALUE OF THE SUBJECT PROPERTY
The Court now turns to the question of value of the subject property of plaintiff Conti at the time of the taking by the defendant EDC on May 28, 1996. The standard the Court must apply to the testimony in this case regarding valuation of real property as established by Rhode Island case law is that ". . . the best estimates of fair-market value are the `prices paid in the open market at or about the time of the taking for substantially similar and comparable properties, when available and when proper adjustments can be made for minor differences between the properties.'" Serzan v. Director of Dept. of Environmental Management,692 A.2d 671, 675 (R.I. 1997) (quoting J.W.A. Realty, Inc. v. City ofCranston, 399 A.2d 479, 482 (1979). "Significant factors that affect comparability include location and character of the property, proximity in time of the comparable sale, and the use to which the property is put." Id., quoting Warwick Musical Theatre, Inc. v. State, 525 A.2d 905, 910 (R.I. 1987). Nichols, The Law of Eminent Domain has stated that a valid comparable sale must be " . . . of substantially the same type of property as that being condemned, and located in the same general area." 7 Nichols, The Law of Eminent Domain, § 4.04 [3] [a] at 4-49 (rev.3d ed. 1985). As noted above, "[a]djustments, and the extent of them, play a very important part and are relevant factors in determining fair-market value." Capital Properties, Inc. v. State of Rhode Island, 1997 WL 839896, p. 4 (R.I. Super. 1997). In addition, the Rhode Island Constitution fundamentally provides that "private property shall not be taken for public use without just compensation." R.I. CONST. Art. I, § 16. Courts within this jurisdiction have unanimously held that a land owner should receive fair and just compensation which includes the fair market value of the land taken at the time of the condemnation.J.W.A. Realty Inc. v. City of Cranston, 121 R.I. 374, 399 A.2d 479
(1979); Ocean Road Partners v. State, 612 A.2d 1107 (R.I. 1992). Fair market value should be based upon the most advantageous and valuable use of the land taken. See Sweet v. Murphy, 473 A.2d 758 Supra (R.I. 1984) (emphasis supplied). See also Capital Properties Inc. v. State of RhodeIsland, 636 A.2d. Our courts have held that significant factors which affect the comparability or parcels include not only location, but also the character of the property, the proximity in time of the sales, as well as the proposed use to which the property would be put. Warwick Musical Theatre, Inc. v. State, 525 A.2d 905, (R.I. 1987).
 PLAINTIFF'S EXPERT
The plaintiff Conti presented Mr. Thomas Andolfo as its real estate expert. Mr. Andolfo, who has testified before this Court on numerous occasions has been certified as a real estate broker and general appraiser in both Rhode Island and Massachusetts. He is a graduate of LaSalle Academy and Holy Cross College and has been engaged in his profession for 20 years. He has instructed at Rhode Island College and served on the Rhode Island Board of Realtors from 1999 to present. Mr. Andolfo's experience in his field is substantial and he was found to be eminently qualified to testify in this case by the Court.
Mr. Andolfo testified to a broad knowledge of the subject area generally and the subject property particularly.
His assignment was to determine the highest and best use of the subject property at the time of the taking.
Mr. Andolfo testified that the subject property was zoned industrial but improved with a single family residence. He testified that residential use was not its highest and best use for the subject property.
He also testified to what in his opinion were significant changes in the immediate vicinity of the subject parcel which was transforming the Route 7 corridor to corporate and office uses. He also testified regarding the Town of Smithfield's proposed ordinance to encourage development of this nature in the area.
Mr. Robert Murray, former Chairman of the Zoning Board of Smithfield testified that office businesses and corporate development were being encouraged by the Town at and around the time of the taking.
Mr. Andolfo and Steven M. Clarke, a professional engineer, testified that the subject parcel had access to all public utilities, had good proximity to a major state highway and had high visibility being located directly across from a business college (Bryant) and the Island Park project itself. Both Mr. Clarke and Mr. Andolfo testified that the highest and best use of the subject property was a medical office building which could be built consistent with Town dimensional regulations, requiring no state or municipal relief.
Mr. Andolfo testified as to value as follows:
 [I]n estimating the fee simple market value for the subject site envisioned to be improved with a 25,750 square foot office structure, i.e., its highest and best use, the appraiser surveyed the local marketplace relative to comparable land sales. Upon analysis, a $6.75 per square foot value was calculated for the subject site based upon its usable area of 90,917 square feet. Therefore, 90,917 square feet x $6.75 per square foot = $614,000 rounded. From this, the appraiser then deducted the cost of demolishing and removing the existing residential dwelling and outbuildings. The appraiser has estimated a cost of $14,000, thereby rendering a net present value for the subject property at $600,000.
Plaintiff's Exhibit No. 24.
The Court has already ruled that this testimony of Mr. Andolfo was based on an enhanced value of the subject property which this Court has ruled cannot be enhanced by the Fidelity project so called, because the subject property was within the scope of the initial project. Mr. Andolfo had also testified that the value of the subject property without enhancement by the Fidelity project would be $427,000.00, and its highest and best use would be a general office building.
The comparable sales chosen by the plaintiff's expert were six in number. The first comparable, sale #1, was property located on North Main Street in the City of Providence, having a land area of approximately 49,610 square feet which was commercially zoned. The sale price of $650,000.00, inclusive of building demolition, rendered a price per square foot of $13.10, unadjusted. The property was developed as a medical office facility and developmental costs were determined to be $68.55 per square foot.
The second comparable, sale #2, also a health care office, was constructed on East Main Road in the Town of Portsmouth for a sale price of $300,000.00. The sale price per square foot was $4.31, unadjusted. Again, a medical office facility was constructed, having approximately 12,788 square feet.
The third comparable, sale #3, was property located on Warren Avenue in the City of East Providence. This lot was zoned commercial having a sale price per square foot of $8.07, unadjusted. A medical office facility was constructed containing 9,946 square feet.
The fourth comparable, sale #4, was property located on Hartford Avenue in the Town of Johnston. The land area was approximately 211,266 square feet, 145,926 being usable. The sale price was $750,000.00 or $5.14 per square foot, unadjusted, and was acquired for purposes of constructing medical offices.
The fifth comparable, sale #5, was located on Metro Center Boulevard in the City of Warwick, having a sale price of approximately $540,000.00 for land area of approximately 89,864 square feet. The property was used to construct a multi-unit Main Stay Suites Hotel.
Finally, the sixth comparable, sale #6, was property located on East Avenue in the City of Warwick, having approximately 122,447 square feet in land area and was acquired in a similar time frame for a sale price of $800,000.00, having an unadjusted square foot value of $6.53. The property was improved for office use.
Employing each of the six comparables, plaintiff's expert testified that he was able to reach an unadjusted mean of the sale of $7.19 per square foot. The median unadjusted sale price was $6.27 per square foot. After these numbers had been identified, the plaintiff's expert performed required adjustments which factored in minor discrepancies in each of the parcels. Plaintiff's Exhibit No. 22. These adjustments, as testified by the witness, were normally and consistently used and accepted in the area of real estate appraisals. Prudently applied, Mr. Andolfo testified, the adjustments fairly and reasonably allow for a per foot value which equates and compares favorably to the subject property. Plaintiff's Exhibit No. 20 at page 13; Plaintiff's Exhibit No. 22.
 DEFENDANT'S POSITION
The defendant argued that Mr. Andolfo's comparable sales should be rejected by this Court because the sales were taken from locations not located in the vicinity of the subject property; that each comparable sale of the plaintiff involved properties of entirely different character from the subject property and required sizable adjustments.
The defendant avers that sales used by plaintiff's expert from Providence, Portsmouth, East Providence, Johnston and two sales in Warwick, along with sizable adjustments, must erode the Court's confidence in these sales as appropriately comparable to the subject property which is industrially zoned and in Smithfield, Rhode Island. The defendant points out that the plaintiff's experts, Mr. Andolfo and Peter Scotti used no Smithfield sales even though Mr. Andolfo and Mr. Scotti did utilize Smithfield sales when they conducted their appraisal of property on Thurber Boulevard in Smithfield and in appraising the subject property for the present plaintiff in 1990.
The defendant, EDC, also argues that the plaintiff's expert, Mr. Andolfo's reliance on developmental trends in the Route 7 Smithfield corridor was not supported by evidence of any market activity supporting these trends and in fact was contradicted by the credible evidence on these market conditions offered by the defendant.
The defendant argues that the evidence from all experts in the case show that these developmental trends did not exist and that the Smithfield real estate market was flat at the time of the taking.
In support of this argument the defendant, EDC, avers that Mr. Andolfo failed to offer any market evidence of the developmental trend he testified about and that he himself testified that the real estate market in Smithfield had declined in 1990 and 1991 and remained stable thereafter — a contradiction of note urges the defendant.
Defendant also cites Mr. Conti's own testimony that as a buy and hold investor he spent no money developing the subject property after he bought it because the timing and market were not right.
Defendant also argues that there was no development whatsoever in the Island Woods Corporate Park, except for Alpha Beta and that the often mentioned Thurber Boulevard property in Smithfield was on the market for 7 years before it sold in 1997, at an amount less than its purchase price years earlier.
 PLAINTIFF'S POSITION ON DEFENDANT'S EXPERTS
Plaintiff Conti urges the Court to reject the testimony of defendant's witnesses based on a lack of expertise and experience when contrasted with that of plaintiff's expert Thomas Andolfo.
In his brief, plaintiff avers that Mr. John P. Ryan was called as a defense witness to testify regarding an appraisal he conducted of the subject property and his opinion of value thereon, in his February 29, 1996 evaluation.
The Court's recollection is that Mr. Ryan was not going to be offered by the defendant EDC in this case, and that Paul E. Vincent a review appraiser would testify on behalf of defendant, EDC and that Mr. Ryan was in fact called by the plaintiff in this case.
Mr. Ryan, it has been argued, was not fully qualified to appraise real estate for commercial or industrial uses. The defendant, EDC, avers that Paul E. Vincent, a review appraiser and overseer of the work of Mr. Ryan, was qualified to appraise the subject property, curing any defect in Mr. Ryan's report. Mr. Vincent was qualified by the Court to testify in this case.
The entire thrust of Mr. Ryan and Mr. Vincent's testimony in this case was that the subject property in this case was appraised and treated as industrial property for industrial use because that is how it was zoned by the Town of Smithfield.
The plaintiff argues that this approach was inappropriate and not supported by the evidence testified to by Mr. Andolfo and Mr. Murray regarding developmental trends of the area and the changing attitude of the Smithfield Zoning Board.
The plaintiff argues that the subject property was immediately adjacent to an office park and directly across the street from a major business college and clearly conducive to the development of an office/business complex as opposed to industrial development.
The plaintiff argues that the defendant's comparables were not appropriate to determine the highest and best use of the subject property because all were highly industrial in character, were suited only for industrial use and did not match the subject property in nature, location, or frontage on a major highway.
Two of Mr. Ryan's comparables were one acre in size, having no acres or visibility amenities. Ryan's third comparable was equally inappropriate having no public utilities and the date of sale predated the taking by over 5 years.
The plaintiff points out that Mr. Vincent's review of Mr. Ryan's appraisal rejected a majority of parcels selected by Mr. Ryan, only utilizing Mr. Ryan's comparable #2 as sufficiently similar to the subject property to be used as a comparable even though it was only one acre in size, served by a septic system and surrounded by industrial uses.
Ann M. Holland testified that she suggested two additional parcels for Mr. Vincent to consider. Both parcels were zoned industrial. These sales were located on George Washington Highway in Smithfield and Thurber Boulevard in Smithfield.
The plaintiff argues that while these two new comparables are physically closer to the subject property than those chosen by the plaintiff's expert, that the plaintiff's expert Mr. Andolfo's comparables were more appropriate than the defendant's sites.
 DEFENDANT'S APPRAISER
After having been duly qualified and accepted as an expert real estate appraiser on behalf of EDC without objection as to his qualifications, Mr. Vincent offered essentially two opinions: First, the fair value of the Conti property at the time he completed his review of the Ryan appraisal on March 5, 1996 was $158,000.00 based upon a $1.00 per square foot value; and second, the fair value of the Conti property as of the condemnation date, May 26, 1996, was the same, $158,000.00.
The defendant urges the Court to accept and adopt the comparables of Mr. Vincent and argues that the defendant did not intend to offer the testimony of Mr. John Ryan and that in preparation for trial, Ms. Ann Holland, Mr. Vincent's supervisor, suggested that he view two parcels of land located in Smithfield to be used as comparables. These parcels were identified and developed by the defendant in preparation for trial.
Using these two new comparables and one from the Ryan report, so called, Mr. Vincent supported his opinion on value through three comparable sales. The first, Plat 49, Lot 175 (Industrial Drive), served as his so-called "reliance" comparable when he conducted his appraisal review of the Ryan appraisal in March 1996. See Defendant's Ex. K and Plaintiff's Ex. 31. Defendant argues that this sale was of sufficient comparability for Mr. Andolfo to use it in his appraisal of the Thurber Blvd. property in September 1996. See Plaintiff's Ex. 23, p. 7 (Sale #2). Moreover, plaintiff argues the sale of a similar parcel in the same industrial park was used by Mr. Scotti when he appraised the Conti property in 1990. See Plaintiff's Ex. 6 (Comparable Sale #2). Mr. Scotti was listed as a plaintiff expert but did not testify at trial.
The other two comparable sales relied upon by Mr. Vincent took place after he had completed his appraisal review in March 1996, and were provided to him by his supervisor, Ann Holland, in the course of preparing for trial. Mr. Vincent investigated and researched these comparable sales in the same manner as any appraiser would in the course of conducting an appraisal. See DPPF No. 57. Both properties, George Washington Highway and Thurber Blvd., were considered reliable comparable sales by Mr. Vincent based upon each of the critical factors for assessing comparability. Both properties were located in close proximity to the plaintiff Conti property (a mile or less), both properties were of the same character as the Conti property (multi-acre, vacant and industrially zoned parcels), both properties were sold about the time of the taking, May 28, 1996, and in fact bracketed that date (March 16, 1996 and January 21, 1997), and both properties were used as, or approved for use as, an office or commercial building.
Mr. Vincent was cross-examined extensively about his opinion on the fair value of the Conti property in general and about his comparable sales in particular. The cross-examination regarding the George Washington Highway and Thurber Blvd. sales focused, primarily, on specific burdens to the properties, including access to and an easement on the George Washington Highway property, and the presence of ledge on the Thurber Blvd. property. As to the latter, the defendant argues that, in his appraisal of the same property, Mr. Andolfo made no reference to the presence of the ledge, and rather noted "[t]he soil content is Cec Canton and Charlton fine sandy loams, 3% to 15% slopes which is suitable for a wide range of possible uses." See Plaintiff's Ex. 23, p. 4. More to the point, however, is post-sale costs and development issues defendant argues are not relevant assessing comparability as evidenced by the Court's refusal to admit numerous exhibits relative thereto into evidence.
In conclusion, the Rhode Island Economic Development Corporation urges the Court to adopt the comparables and testimony of Mr. Vincent stating that Mr. Vincent's testimony was direct and to the point — there was insufficient evidence in the market to support adjusting for these or other factors, such as the visibility of Conti property. More specifically, Mr. Vincent testified that, in a flat real estate market with very little sales activity as in Smithfield, what might otherwise be adjustable differences between sales collapse against themselves as the market data simply does not permit quantifying such nuances. See DPPF Nos. 60 and 61.
In the final analysis urges defendant, the Rhode Island Economic Development Corporation, Mr. Vincent's testimony and the three comparable sales selected by him are more convincing and credible than the sales relied upon by Mr. Andolfo and the marked for high-end office development he attempted to establish in Smithfield.
 COURT'S ANALYSIS
The Court in its review of the evidence concerning value of the subject property has considered the testimony of the expert witnesses for both the plaintiff and the defendant. The Court has considered their qualifications, their opinions as to value, the comparable sales selected by each and the basis for the witnesses' opinions regarding market conditions, property values and the highest and best use reasons why each comparable was selected by each witness.
This Court has had the benefit of the testimony of Mr. Thomas Andolfo on several occasions over the past several years. The Court is well aware of his experience, expertise and academic and professional credentials. The Court has not heretofore heard testimony from Mr. Edward Vincent. The Court acknowledges that Mr. Vincent, while qualified to testify in this case, does not possess the depth or breadth of experience displayed by Mr. Andolfo.
The Court in this case, however, finds the testimony of Mr. Vincent on the question of value of the subject property at the time of the taking, the selection of comparables used by him, and his opinion of market trends and condition of the general Smithfield, Rte. 7, Corridor in this case to be more relevant probative and material on these important questions than the examples and opinions offered by Mr. Andolfo and the Court finds as a fact and as a conclusion of law that the plaintiff has failed to prove its case by a fair preponderance of the evidence.
The Court finds that Mr. Andolfo's six comparable sales were not appropriate to compare to the subject property because of the disparate location of all six parcels to the subject property.
The character of the subject property is rural, industrial zoned and located in a geographical area which this Court finds as a fact was virtually devoid of sales activity from the early 90's to the time of the taking by the defendant.
The character, location, makeup and demographics of the plaintiff's comparables bear little, if any, resemblance to that of the subject property. Most of the six are located in highly developed areas of the state: North Main Street in Providence — Warren Avenue in East Providence — Hartford Avenue in Johnston and Metro Center Boulevard and East Avenue in Warwick. Even the East Main Road location in Portsmouth is a far cry from the characteristics of the subject property.
It is obvious that the analysis of the six comparables was made in expectation that a medical office building was the highest and best use of the subject property. Once the determination was made that the enhancement theory espoused by the plaintiffs was not successful, the sites selected by the plaintiff lost their probative value when contrasted with the location of the subject property and the market conditions in the area of this location.
This Court believes that the comparables chosen by the defendant, Economic Development Corporation, through Mr. Vincent, more correctly correlate to and reflect the nature and characteristics of the subject property, are in the immediate vicinity of the subject property, and are all zoned industrial as is the subject property.
This Court finds that the testimony of Mr. Vincent that the subject property when considered under the appropriate statutory and case law guideline was vacant land, industrially zoned in rural Smithfield. The fact that the plaintiff has been able to identify problems with defendant's comparables regarding lack of certain public visibility, deficiencies in public utility development and locations not as advantageous as the location of the subject property is not persuasive. Even with these acknowledged infirmities, this Court finds as a fact that the three comparables, all located in Smithfield, most appropriately reflect the character of the subject property.
Similarly, the Court has considered the plaintiff's criticism of Mr. Ryan and his work product and the review procedures conducted by Mr. Vincent as review appraiser as well as the late entry of two comparables at the suggestion of Ms. Holland.
On balance and faced with the evidence provided by the plaintiff through Mr. Andolfo and that of the defendant through Mr. Vincent, the Court is of the opinion that Mr. Vincent, in conducting his review, including the two comparables suggested by Ms. Holland, examined Mr. Ryan's work and made his own findings and recommendations in accord with all relevant federal and state regulations usually and customarily considered in presenting appraisals of this type in land valuation cases.
The Court finds as a fact that Mr. Vincent's factual data in his testimony and report were complete and thorough and his factual data presented both with regard to his selected comparables, the value of the subject property at the time of the taking and his testimony concerning his research on current market conditions in the area of the subject property was cogent and appropriate and the Court finds that his conclusions follow the facts as presented in a logical and reasonable manner.
The Court finds that Mr. Vincent's testimony on the record was straightforward, candid, reliable and credible.
The Court therefore adopts the theory of market condition and lack of sales activity that at the time of the taking the subject property's highest and best use was as it was zoned, industrial, with other uses allowable upon special application and adopts as a fact and conclusion of law and in accordance with Mr. Vincent's testimony and his prepared written narrative of his findings of March 6, 1996 (Plaintiff's Ex. 31 and Defendant's Ex. K) that the subject property's market value at the time of the taking was $158,000.00 — which is $1.00 per square foot less demolition costs.
The Court further finds for the record:
That the Smithfield real estate market was at best flat or declining was supported by a paired sales analysis. First, the Thurber Blvd. property, which sold for $220,000 in 1988, sold for only $140,000 in January 1997. In connection with that sale, Mr. Andolfo himself appraised the property for Citizens Bank and valued it at $152,000 ($1.00 per square foot) as of September 13, 1996. Second, a one-acre parcel in the so-called Land Rex industrial park sold for $85,000 in 1989, while a similar one-plus acre parcel in the same industrial park sold for only $50,000 in 1994. See Plaintiff's Ex. 6 (comparable sales #1 and #2), Defendant's Ex. K (comparable sale #1), Plaintiff's Ex. 31 (comparable sale #1), Plaintiff's Ex. 23 (comparable sale #2), and testimony of Paul E. Vincent.
Based upon the available comparable sales data, Mr. Vincent's opinion is that the market value of the Conti property in May 1996 was $158,000.00 ($1.00 per square foot less demolition costs), without any adjustment on account of the fact that approximately one-half of the property was undevelopable wetlands. See Testimony of Paul E. Vincent.
The Court does not adopt Mr. Andolfo's opinion on the fair value of the Conti property because:
1. The comparable sales he relied upon were of parcels located nowhere near the Conti property and in entirely different markets, were of parcels zoned differently than the Conti property, and were of parcels located in significantly more developed areas, for all of which he made no adjustments whatsover;
2. The adjustments he did make to his comparable sales were of such a magnitude as to render the sales unreliable;
3. His reliance on so-called developmental or economic trends in the area was wholly unsupported by any sales data from the Smithfield real estate market;
4. He failed to consider available comparable sales from Smithfield as Mr. Scotti had when appraising the Conti property in 1990 and as Mr. Andolfo himself had when appraising the Thurber Blvd. property in September 1996;
5. By his own testimony, he confirmed that the real estate market in Smithfield remained at best stable between when Mr. Conti purchased his property in 1990 until it was acquired by the Rhode Island Economic Development Corporation in May 1996; and
6. He offered no evidence or sales data from the Smithfield market to support a 325% increase in the value of the Conti property over this same time period.
The Court adopts Mr. Vincent's opinion on the fair value of the Conti property because:
1. From the time Mr. Conti purchased the property in 1990 until it was acquired by the Economic Development Corporation in May 1996, the real estate market in Smithfield was at best stable or flat;
2. There was no market or sales data to indicate that real estate prices in Smithfield had increased;
3. The available paired-sales data for industrially zoned land in proximity to the Conti property demonstrated a decline in values during this same time period;
4. The comparable sales used by Mr. Vincent were located in close proximity to the Conti property, were of the same character as the Conti property, were close in time to the taking, and involved properties of similar use;
5. The comparable sales used by Mr. Vincent were reliable as these or similar sales had previously been relied upon by Mr. Scotti when appraising the Conti property in 1990 and by Mr. Andolfo himself when appraising the Thurber Blvd. property in September 1996; and
6. There was insufficient Smithfield real estate market or sales data to support adjustments to Mr. Vincent's comparable sales to reflect surrounding uses to the properties or any economic or developmental trends in the surrounding area.
Based upon the record in this case, the Court finds as a matter of fact that, by a preponderance of the evidence, the fair value of the plaintiff's property was $158,000.00, at the time it was acquired by the Economic Development Corporation, based upon a rate of $1.00 per square foot, inclusive of demolition costs.
Judgment may enter that the plaintiff has received just compensation for his property, that the plaintiff's Petition be dismissed in its entirety with prejudice.
[1] After both sides rested, the Court, upon motion by EDC, dismissed all counts of the plaintiff's Petition, other than the assessment of damages count (Count 1). Specifically, the Court dismissed various counts challenging the constitutionality and propriety of EDC's exercise of its condemnation powers with respect to the Conti property.